**In re SHAWN M.**

**No. 2004–350–Appeal.**

Supreme Court of Rhode Island.

May 17, 2006.

Catherine A. Gibran, Providence, for Petitioner.

Karen A. Clark, Providence, for DCYF.

Frank P. Iacono, Jr., for CASA.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## O P I N I O N

Justice GOLDBERG, for the Court.

This is an appeal from a Family Court decree terminating the parental rights of the respondent-mother, Catherine (Catherine or mother).[1] Unfortunately, at all times relevant to this appeal, Catherine was addicted to drugs. On November 15, 2000, Shawn, born May 1, 1994, and his sister Amanda, born March 11, 1989, were found to be neglected and committed to the care, custody and control of the Department of Children, Youth and Families (DCYF).[2] Over the course of the next several years, many efforts were made to reunify Catherine with her children. However, with respect to Shawn, these efforts proved unsuccessful, and, on January 9, 2004, DCYF filed a petition seeking to terminate mother's parental rights to Shawn based on G.L.1956 15–7–7(a)(2)(iii) (unfitness because of chronic substance

---

1. The child's father's rights were voluntarily terminated on May 24, 2000.

2. This case originally opened as to both Shawn and his sister Amanda. Amanda, however, was not the subject of this termination petition.

abuse problem), 15–7–7(a)(2)(vii) (conduct seriously detrimental to the child), and 15–7–7(a)(3) (twelve months in state custody without substantial probability of child's safe return within a reasonable period).[3] After trial, the trial justice issued a written decision and found that Catherine was unfit to parent Shawn based on the allegations of unfitness because of chronic substance abuse and the fact that Shawn was in DCYF custody for more than twelve months without a substantial probability of his safe return within a reasonable period. The trial justice then concluded that the termination of Catherine's parental rights was in Shawn's best interests. For the reasons stated herein, we affirm the judgment of the Family Court.

## Facts and Travel of the Case

This family came to the attention of DCYF in March 1999, when Catherine's probation officer informed DCYF that Catherine had been using cocaine and was not complying with court-ordered substance abuse treatment. Thereafter, DCYF conducted its own investigation and discovered a history of drug abuse, mental health issues, and incarceration.[4] On November 15, 2000, Catherine's children were found to be neglected by their mother and were committed to the care, custody and control of DCYF.

Initially, Shawn was residing in a group home and his sister was residing in a non-relative foster home. The DCYF caseworker assigned to the family testified that, after Catherine was released from prison, she began participating in several rehabilitative programs as part of her case plan. She was receiving mental health services at the Johnston Mental Health Center and substance abuse counseling from the Providence Community Action Program (PROCAP). Additionally,

---

3. Relevant provisions of G.L.1956 § 15–7–7 are provided below for reference purposes:

"**Termination of parental rights.**—(a) The court shall, upon a petition duly filed by a governmental child placement agency or licensed child placement agency after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child, if the court finds as a fact by clear and convincing evidence that:
" * * *

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:
" * * *

"(iii) The child has been placed in the legal custody or care of the department for children, youth, and families and the parent has a chronic substance abuse problem and the parent's prognosis indicates that the child will not be able to return to the custody of the parent within a reasonable period of time, considering the child's age and the need for a perma-nent home. The fact that a parent has been unable to provide care for a child for a period of twelve (12) months due to substance abuse shall constitute prima facie evidence of a chronic substance abuse problem;
" * * *

"(vii) The parent has exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time;
"(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

4. At the time DCYF began monitoring the family, Catherine was incarcerated and would remain so until June 1999. Shawn and his sister were living with relatives.

mother was referred to the Providence Children's Museum Families Together Program (Children's Museum Program) providing for biweekly visits with Shawn.

Catherine eventually completed the Children's Museum Program, and visitation was increased to unsupervised and overnight visits. In April 2001, after a fire in the foster home in which her daughter was living, Catherine was reunified with her daughter. However, according to the family's caseworker, Catherine experienced difficulty getting her daughter to school. The record also indicates that, although Catherine participated in PRO-CAP substance abuse counseling, she skipped her final discharge appointment with her counselor.[5] Despite these setbacks, DCYF continued to help Catherine achieve the goal of the case plan—reunification with Shawn.[6]

On October 11, 2001, after almost two years in state custody, Shawn was reunified with his mother. He was seven years old. The DCYF implemented aftercare services in an effort to provide continued mental health and substance abuse counseling for Catherine. Unfortunately, on January 3, 2002, DCYF again was notified that Catherine had been incarcerated. Shawn was returned to the group home and his sister was placed with a relative.

Catherine was released from prison on April 6, 2002; the children remained in state custody, with supervised visits with mother. Catherine also began receiving substance abuse counseling from the CO-DAC treatment center in Cranston and mental health counseling at the Newport County and Kent County Mental Health Centers. However, despite these services, Catherine's problems continued. In July 2002, she tested positive for cocaine, but alleged that the drug had been slipped in a drink as part of a possible date rape scheme. In October 2002, during the course of a home visit from her DCYF caseworker, Catherine admitted to smoking two bags of cocaine. Catherine also admitted to the caseworker that she and her daughter had discussed her drug use, and the child was aware of Catherine's addiction. Catherine enrolled in yet another treatment program at PROCAP and the Providence Center.

According to DCYF, Catherine was discharged from CODAC, PROCAP, and the Providence Center programs for noncompliance. Mother admitted that she was discharged from PROCAP for noncompliance and that her counselor recommended that she receive residential substance abuse treatment. She also admitted that she was discharged from the Providence Center Program because she refused to provide urine screens. However, Catherine alleged that she was discharged from CODAC because she had chosen to pursue treatment with PROCAP.

On January 13, 2003, DCYF filed a petition for termination of Catherine's parental rights (TPR) to Shawn.[7] However, because Catherine reenrolled in CODAC and obtained stable housing, this TPR petition was dismissed without prejudice by agree-

---

5. Upon being questioned about her absence by her DCYF caseworker, Catherine began screaming that the caseworker should be more concerned about the welfare of her children than the fact that she missed appointments.

6. According to DCYF, as many as ten case plans had been developed for Catherine while it was involved with this family, and the vast majority maintained reunification as their goal.

7. At this time, Shawn was living with a therapeutic foster family. The record indicates that Shawn's initial adjustment to the foster family was difficult, but he has now bonded with its members and the family indicated that it is interested in adopting Shawn should he become available for adoption.

ment of the parties. The parties further agreed that Catherine would submit to two urine screens per week at CODAC and that DCYF no longer was obligated to make reasonable efforts toward reunifying Catherine and Shawn.

Catherine's efforts to achieve sobriety and stay out of trouble again proved futile. In May 2003, she tested positive for cocaine and was discharged from CODAC for failing to contact her counselor for more than thirty days. On August 29, 2003, after Catherine missed a scheduled visit with Shawn, a DCYF caseworker discovered that Catherine was in prison again.

Catherine was released from incarceration in November 2003. She again enrolled with CODAC for substance abuse treatment and still was required to submit to two drug screens per week under the previous agreement reached with DCYF. The record indicates that Catherine was insufficiently compliant with rehabilitation. Although attending counseling sessions, she still produced positive drug screens in February and May 2004. Additionally, the record does not indicate that Catherine ever complied with the DCYF agreement that she submit to two drug screens per week. According to the family's caseworker, Catherine had indicated that she "wasn't going to comply with [the drug screens] until DCYF complied with her." Moreover, when the caseworker inquired about her current substance abuse treatment, Catherine refused to release her CODAC records and referred the caseworker to her lawyer.[8]

The DCYF filed another TPR petition, and a trial was held in May 2004. In a forty-page written decision, the trial justice, on June 1, 2004, granted the petition and found that mother was unfit because of chronic substance abuse and because Shawn was in DCYF custody for more than twelve months without a substantial probability of safe return within a reasonable period.[9] The mother appealed.

## Standard of Review

 It is well settled that when reviewing a termination of parental rights decree, this Court examines the record to determine whether the findings of the trial justice are supported by legally competent evidence. *In re Brianna D.,* 798 A.2d 413, 414 (R.I.2002). "[T]he findings of a trial justice are entitled to great weight and will not be disturbed unless the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *In re Marcella,* 834 A.2d 717, 718 (R.I. 2003). To protect a parent's fundamental liberty interest in the care and maintenance of his or her children, parental rights may not be terminated until "the state proves by clear and convincing evidence that the parent is unfit." *In re Nicole B.,* 703 A.2d 612, 615 (R.I.1997). "[O]nce a parent has been adjudicated unfit, [however,] the balance shifts so that the 'best interests of the child outweigh all other considerations.'" *Id.* (quoting *In re Kristen B.,* 558 A.2d 200, 203 (R.I.1989)).

## Analysis

### I

### Unfitness Determination

Catherine alleges that the trial justice's finding of unfitness based on chronic sub-

---

8. The record indicates that Catherine did not initially permit her CODAC records from 2004 to be released to DCYF. She eventually signed an authorization of release form on May 14, 2004—two days after the trial started.

9. The trial justice issued a thorough forty-page written decision in which he reviewed the testimony of all relevant witnesses, summarized the exhibits and performed a careful analysis of the issues raised by the parties.

stance abuse and DCYF's custody of Shawn for more than twelve months without a substantial probability of his safe return within a reasonable period was both clearly wrong and unsupported by the evidence in the record. According to Catherine, her drug abuse amounted to nothing more than an "occasional lapse;" and she contends that "there was not one scintilla of evidence" indicating that Shawn could not be returned safely within a reasonable period. We cannot agree with these contentions.

### a. Catherine's Chronic Substance Abuse

■ With respect to the finding of unfitness because of chronic substance abuse, this Court has defined the term chronic as "[w]ith reference to diseases, of long duration, or characterized by slowly progressive symptoms; deep seated and obstinate, or threatening a long continuance * * *." *In re Tara P.*, 836 A.2d 219, 223 (R.I.2003) (quoting *In re Suebun V.*, 766 A.2d 939, 943 (R.I.2001) and Black's Law Dictionary 941–42 (6th ed. 1990)). After reviewing the record, we are satisfied that the trial justice's finding of chronic substance abuse is supported by legal and competent evidence.

Catherine's CODAC records indicate that she first began using cocaine at age nineteen; she is now forty years old and has been using drugs for more than half her life. Although Catherine alleges that she experiences only occasional lapses from sobriety, the record does not support this argument. Catherine's slips are anything but isolated events; she has tested positive for cocaine on several occasions. Given her consistent failure to submit to testing, this is a significant factor that weighs against her. Although Catherine was required to undergo two tests per week in accordance with her agreement with DCYF, her caseworker testified that

Catherine failed to comply with that agreement. Moreover, mother initially refused to release her most recent CODAC records to DCYF. She ultimately authorized their release after the trial started.

Additionally, Catherine was discharged from several rehabilitative programs, including CODAC, PROCAP, and The Providence Center. These failed efforts were paralleled by three stints in jail. We note that mother's most recent positive drug screen occurred only six days before trial. The general consensus among rehabilitative service providers was that Catherine requires more intensive substance abuse counseling.

We are satisfied that there is abundant evidence in the record to support the trial justice's finding of chronic substance abuse by clear and convincing evidence.

### b. Probability of Shawn's Safe Return within a Reasonable Period

■ Catherine contends that "there was not one scintilla of evidence" to support the finding that Shawn could not be returned safely within a reasonable period. Contrary to Catherine's contention, this record is replete with clear and convincing evidence that "there is not a substantial probability that the child will be able to return safely to the [mother's] care within a reasonable period of time considering the child's age and the need for a permanent home[.]" Section 15–7–7(a)(3).

The trial justice found that Shawn was in DCYF custody for more than a year and that Catherine was offered or received services to address the reasons for Shawn's placement. Despite these services, the trial justice concluded that Shawn "cannot be successfully returned to his mother within a reasonable period of time based upon the mother's prognosis."

Specifically, the trial justice noted that, with the exception of a ten-week period, Shawn has been in state custody since 1999 and that Catherine failed to fully avail herself of DCYF's reasonable efforts toward reunification. The trial justice also noted that Catherine consistently failed to follow through with substance abuse treatment, refused to release her CODAC records to DCYF, and had a positive drug screen only six days before the trial. The trial justice found that mother failed to acknowledge her self-destructive and addictive behavior, a finding that defeats any suggestion that Shawn could be returned to her within a reasonable time.

Given the foregoing, and in recognition of Shawn's age and need for permanency, the trial justice concluded that Catherine was unfit to parent Shawn in accordance with 15–7–7(a)(3)—a finding with which this Court agrees.

## II

### Best Interests Determination

■ The termination of parental rights is a tragic event. *In re David L.*, 877 A.2d 667, 673 (R.I.2005). Although we are mindful of Catherine's struggles with mental illness, substance abuse, and lack of stable housing, once unfitness is established, the primary focus no longer is on the parent, but on the child's best interests. The best interests and welfare of the child outweigh all other considerations. *In re Kristen B.*, 558 A.2d at 203. Every child has a right to reasonable care and maintenance; to be free from abuse or neglect, with the hope of spending the remainder of his or her childhood in a family setting in which the child may grow and thrive. *In re Raymond C.*, 864 A.2d 629, 634 (R.I.2005). Children "are entitled to permanency; they should not have to wait for an indeterminate period of time to find out if their parents will successfully obtain and maintain a substance free lifestyle." *In re Eric K.*, 756 A.2d 769, 772–73 (R.I.2000).

Shawn is now twelve years old. Although the record discloses that Catherine clearly loves him and has made some attempts at rehabilitation, these factors are insufficient to overcome the child's right to a permanent and stable home. "[A] parent's genuine love for [her] child, or an existence of a bond between parent and child, is not sufficient to overcome the child's fundamental right to a safe and nurturing environment." *In re Brianna D.*, 798 A.2d at 415. Shawn has been in state custody for all but a few weeks of the past six years, and Catherine never has assumed full responsibility for Shawn's emotional, financial or physical needs. Since November 2002, Shawn has resided in the same preadoptive home where he has flourished. Shawn has a right to remain with the family that has cared for him and with whom he has bonded.

Given the foregoing, there is ample legally competent evidence in the record to support the finding that termination of Catherine's parental rights was in Shawn's best interests.

## III

### Conclusion

There is ample evidence to support the trial justice's finding that DCYF proved by clear and convincing evidence that the respondent-mother is unfit and that the termination of her parental rights is in Shawn's best interest. Accordingly, the decree of the Family Court is affirmed. The papers in this case shall be remanded to the Family Court.